[Crim. No. 10708. In Bank. Dec. 23, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. HERMAN YVONNE RISENHOOVER, Defendant and Appellant.

Molly H. Minudri, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, Edsel W. Haws and Raymond M.

Momboisse, Deputy Attorneys General, for Plaintiff and Respondent.

BURKE, J.—An information was filed charging Herman Yvonne Risenhoover with the murder of Gary Farina on August 8, 1962, and with one prior felony conviction for grand larceny and two for second degree burglary. On October 22, 1962, the court found defendant presently insane, suspended the criminal proceedings, and committed him to Atascadero State Hospital. About four months later, after the superintendent of the hospital certified that defendant was now sane, the court ordered him returned to the court. A jury found him guilty of first degree murder and sane and fixed his penalty at death. The trial court granted motions for a new trial on all issues.

Defendant admitted the prior convictions, and entered pleas of not guilty and not guilty by reason of insanity. Upon retrial the jury again found him guilty of first degree murder. He then withdrew his plea of not guilty by reason of insanity, and the jury again fixed his penalty at death. A motion for a new trial, reduction of the degree of the crime and modification of punishment was denied, and defendant's automatic appeal is now before us. (Pen. Code, § 1239, subd. (b).)

Defendant contends (1) the court erred in allowing the prosecutor to ask veniremen questions relating to the felony-murder rule and in giving instructions on that rule, (2) the evidence is insufficient to support the first degree murder verdict in view of the *Wells-Gorshen* rule of diminished capacity, (3) the court erroneously denied a motion for a change of venue, (4) the court erred in admitting evidence and giving an instruction and (5) under *Witherspoon* v. *Illinois,* 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], veniremen were improperly excused for cause on the ground of their opposition to the death penalty. We have concluded that the first four contentions cannot be upheld and that the judgment as to guilt should be affirmed but that under the compulsion of *Witherspoon* the death penalty must be set aside and defendant remanded to the trial court for a new trial limited to the issue of penalty.

### The Evidence

On August 7, 1962, defendant visited a trading post in Clingan's Junction, which is near Squaw Valley, both of which are in Fresno County. He was then in violation of the terms of his parole since he had not been given permission to

leave Los Angeles County. Defendant showed Mr. C. T. Coffelt, the owner of the trading post, a stolen rifle (the weapon that was used the next day to kill the decedent) and asked if it was in working condition. Mr. Coffelt, after checking it, stated that it was. Defendant wanted to trade the rifle for a pistol and said that he would have "to trade even" because he had no money with him. Mr. Coffelt said he might have time that evening to check a pistol he had that was possibly defective. Defendant gave his name on this occasion as Mr. Dietrich.

About 7 a.m. the next day defendant returned to the trading post, and Mr. Coffelt said he had not yet checked the pistol. Defendant offered to sell for $.50 a gun stolen earlier the same day and said that he needed some gasoline and cigarettes. Mr. Coffelt paid him $2.00 for the gun. On neither date did Mr. Coffelt notice anything unusual about defendant's manner, conduct or speech, although matters such as defendant's color made Mr. Coffelt suspect that defendant had been in jail or that "something wasn't exactly right."

Mr. Albert Abe, the owner of a Squaw Valley service station that defendant visited several times on August 8, 1962, between 11 a.m. and 4 p.m., similarly noticed nothing unusual about defendant's conduct and found his conversations responsive. Defendant was driving a stolen station wagon on August 7 and 8, 1962.

On the evening of August 8, 1962, the station wagon was seen at Avocado Lake, which is about 16 miles from Squaw Valley. Gary Farina, age 18, and his friend Constance Newlands, age 16, had been swimming in the lake that day and decided to leave about 9 p.m. When they walked over to Gary's car, which was parked near the lake, they encountered defendant, who pointed the rifle at Gary and said, "Take me to Squaw Valley." Gary agreed to do so and asked defendant if he wanted the car. Defendant replied, "No. I just want you to take me to Squaw Valley." He also told them not to try to jump him, that the gun was loaded, and that he did not want to hurt them. Defendant handed tape to Constance and told her to tape Gary's hands, but Gary said that was unnecessary and he would not jump defendant and would drive, and defendant agreed. Gary drove, Constance sat beside him, and defendant sat in the back with the rifle. When they passed the station wagon defendant said "he had been fishing . . . and . . . was out of gas." Gary asked if defendant wanted some gas and defendant replied, "No."

Gary drove over a mountainous-type road and on reaching

Highway 180 turned left towards Kings Canyon Park. After they went a short distance, defendant said they had gone too far and to turn around and go back. They drove back past where they had originally reached the highway and continued on the highway until they came to a sign showing that Squaw Valley was a mile to the left. They turned left and, when they were in the general area of Squaw Valley, defendant told Gary to continue driving, and they eventually reached the highway again. Thereafter, they drove towards Orange Cove. According to Constance, up to this point defendant was rational and coherent, and she noticed nothing unusual about his actions or mannerisms except that his speech was slow. After they drove a few miles further defendant told Gary to pull over because they were approaching the town, and Gary said "No" that the town was still some distance away, and defendant said, "Okay." Gary drove several miles more but stopped when defendant told him to do so. At defendant's request Gary taped Constance's hands behind her, and defendant then taped Gary's hands behind him. Afterwards, defendant drove the car with Gary and Constance as passengers. At first defendant had difficulty operating the car, but his driving improved after he drove a while.

Defendant drove through Orange Cove and headed towards the country. After going several miles defendant parked in an area where there were vineyards on one side of the road and orchards on the other. He sat there for a few minutes because there was a car coming towards them. Then he told them to get out of the car and that he wanted to take them a short distance as hostages. Constance said she could not get out because she was barefoot and there were "stickers" outside. Gary told defendant Constance would stay in the car and wait for him. She locked one door, and defendant locked the other and told her not to try to flag another car or blow the horn. She succeeded in untaping her hands. After a few minutes she heard a shot, but she remained in the car, waiting for Gary to return. Defendant returned alone and told her to get out of the car and that Gary was all right. She became scared and began to blow the horn and scream. As she unsuccessfully tried to start the car, defendant rammed his rifle through the window, and she left the car on the side opposite him. He overtook her and hit her head with the rifle butt, inflicting severe injuries. He hit her again after she fell but she got up and ran down the road screaming.

She reached a farmhouse, which was a short distance from Gary's car, but was unable to get any response there and ran

a little farther down the road before a passing motorist saw her and stopped. The motorist took her to the farmhouse where they were admitted, and a constable was called. The constable arrived about 12:15 a.m. on August 9, 1962, and, after talking to Constance, observed Gary's car parked beside the road and found him in the orchard about 225 feet from his car. His hands were still taped behind him, and he had a bullet in his back. He was taken to a hospital where he died that same day. According to the autopsy surgeon, the cause of death was hemorrhage resulting from a bullet wound that penetrated the heart.

The lethal rifle required a trigger pull of six pounds, and a criminologist concluded from tests he performed that the rifle had been fired at least 5 feet away from the victim.

Defendant was arrested on the evening of August 9, 1962, as he was walking along a road near Pixley. He was then carrying the rifle and wearing clothing that was stolen earlier on the same day. According to the arresting officer, defendant was "calm, well spoken . . . sort of slow talking but responsive . . . in [their] conversations."

In the early morning of August 10, 1962, a stolen Chevrolet was recovered about 8 miles from where defendant was arrested. The Chevrolet had been taken from a driveway about a mile from where Gary was shot. The owner of the car had parked it in his driveway about 7:30 p.m. on August 8, 1962. He did not notice if the car was there the next morning and discovered it was gone that afternoon. Heel marks of the same type and size were found in the area of the driveway, near the stolen station wagon at Avocado Lake, and at the scene of the crime. Such heel marks were observed going into a vineyard near Gary's car and coming out of the vineyard near the driveway where the Chevrolet was taken.

Psychiatric testimony was introduced by defendant to support his defense of diminished capacity, and the prosecution introduced psychiatric testimony in rebuttal. The testimony of the psychiatrists included a case history which they elicited from defendant and in composite indicated:

Defendant's father was a bootlegger who was an alcoholic and his mother was a prostitute and drug addict. They separated when he was 13, and he lived briefly with his mother but she abandoned him and he was placed in a home for boys. From 1941 until 1948 he was imprisoned in Oklahoma. In 1948 he was arrested for burglary in California and was sent to San Quentin, where he remained until 1951. During that

incarceration he received electric shock treatments.[1] In 1952 he was committed to Mendocino State Hospital, where he was confined for 11 months. He ran away from that hospital, committed burglary, and was sent to San Quentin in 1953. While incarcerated, he again received electric shock treatments, apparently before 1955. He was not released from prison until July 1962.

Defendant related to the psychiatrists his versions of the killing and two attempts by him to commit suicide, the first by lacerating himself several days after the killing and the second by an overdosage of pills in 1964.[2] Dr. Robert Kinsey stated that he verified the seriousness of the first attempt by hospital records and that he did not regard the second attempt as a serious one.

Several psychiatrists called as witnesses by the defense (Dean Archer, M.D., Harry Bramwell, M.D., Jackson Dillon, M.D., Paul Golden, M.D., Walter Rapaport, M.D., and Mark Zeifert, M.D.) testified that defendant was a chronic schizophrenic. Drs. Archer and Golden examined defendant in April 1966, i.e., before the killing; the others on various dates after the killing. Some of these psychiatrists expressed the view that at the time of the killing defendant had diminished capacity to form an intent to rob or kill and either was too ill to premeditate and deliberate or had diminished capacity to do both.

Two additional psychiatrists (Eric Marcus, M.D., and Robert Kinsey, M.D.), who examined defendant after the killing, were called to the stand in his behalf. Dr. Marcus testified that he found no evidence defendant was psychotic but that defendant might be labeled a schizoid personality with severe inadequacy and sociopathic trends and that in August 1962 defendant's mental illness reduced his ability to form an intent to kill or rob or to premeditate and deliberate but did not prevent him from forming such intents or premeditating and deliberating. Dr. Kinsey was of the opinion defendant was a schizoid personality with depression and stated that this condition "is a continuing [sic] towards [a] schizophrenic reaction." According to Dr. Kinsey, on August 8 and 9, 1962, defendant was incapable of forming "the intent to

---

[1]Records of defendant's medical history confirmed that "he had had electric shock treatments at San Quentin."

[2]The jury was instructed in part that defendant's incriminating statements to psychiatrists might be considered only for the limited purpose of showing the information on which the psychiatrists based their opinion.

commit murder'' and his capacity to form an intent to steal was limited.

. In rebuttal, Frederick Schnell, M.D., a staff psychiatrist with the Department of Mental Hygiene, testified that in his opinion on August 9, 1962, defendant was able to premeditate and deliberate and to form the intent to rob and kill and that his capacity to do so would not be diminished below that of a normal person. Dr. Schnell's examination and observation of defendant covered two periods, each of which lasted several months.

The first began in June 1961 following defendant's commitment to Atascadero State Hospital after Drs. Golden and Archer had diagnosed him as schizophrenic and he had been adjudicated insane. He was placed under Dr. Schnell's supervision at Atascadero. Dr. Schnell stated that after he examined defendant and observed him over a period of time he disagreed with the diagnosis of schizophrenia and diagnosed defendant as having ''sociopathic personality disturbance with an antisocial reaction,'' that the diagnosis of the Atascadero staff (which included Dr. Schnell) was ''personality pattern disturbance, schizoid personality,'' and that neither condition was a psychosis. Dr. Schnell stated that he concluded defendant was schizoid rather than schizophrenic because ''he had no impairment to the degree that I would evaluate as psychosis;'' that defendant ''was capable of abstract thinking so far as planning on how to carry out a trip or what he was going to do the next day and that sort of thing,'' whereas a schizophrenic's ability to plan is markedly impaired; that defendant could recall a large percentage of things that happened in his life back to his childhood, whereas a schizophrenic has ''a disability of recalling'' matters; and that defendant and other schizoid personalities are in contact with reality, whereas a schizophrenic in deep psychosis loses all contact with reality, although a schizophrenic functioning in a psychotic area part of the time can maintain some contact with reality. Dr. Schnell also found in his examination of defendant no evidence of hallucinations or delusions or bizarre thinking whereas a schizophrenic's thinking is disassociated. Dr. Schnell did not recall exactly how long defendant was in Atascadero in 1961 but stated that, since it was concluded defendant was not psychotic, Dr. Schnell's best judgment was that defendant would have been released from Atascadero in the minimum time, which would have been in excess of 90 days.

The second period during which Dr. Schnell studied

defendant began around November 1962 after defendant's second commitment to Atascadero. During part of this hospitalization defendant was again under Dr. Schnell's supervision. The doctor estimated that he talked with defendant individually during this period for about 12 or 15 hours. According to Dr. Schnell, defendant was again diagnosed as "personality pattern disturbance, schizoid personality." On cross-examination the defense elicited from Dr. Schnell that defendant received electro-shock treatments during the first week or two of his second hospitalization at Atascadero before being transferred to the ward supervised by Dr. Schnell.

The prosecution also introduced the deposition of Paul Levy, M.D., a court-appointed psychiatrist who examined defendant in July 1963. According to Dr. Levy, defendant had a schizoid personality disorder, which is not a psychosis. Dr. Levy explained that a schizoid personality is one who, among other things, is emotionally isolated from others and generally develops a retreat from life and that such a disorder differs from schizophrenia, which is a psychosis. In answer to a hypothetical question Dr. Levy expressed the view that, assuming the facts in the question were true, on the day of the killing defendant had the capacity to form the intent to rob and to premeditate and deliberate.

A prison inmate, who was incarcerated with defendant in 1964, testified that defendant said that he had engaged in unusual conduct, such as taking an overdose of pills in 1964 and throwing trays around, to make people believe he was out of his mind so he would receive a life sentence and that he would try to make the psychiatrists believe he was insane.

It was stipulated that evidence received at the guilt trial be considered as evidence at the penalty trial, and additional evidence was introduced by both sides at the penalty trial.

1. *Voir Dire and Instructions Regarding Felony-Murder Rule*

During *voir dire* the prosecution asked prospective jurors if they would follow an instruction that all murder committed in the perpetration of or attempt to perpetrate robbery is murder in the first degree whether it is intentional, unintentional, or accidental. if such an instruction were given by the court. Defendant objected to the questioning on the grounds that he was not charged with robbery and that the statute of limitations had run on all crimes except the murder. The court overruled the objections, and defendant

contends that the court thereby erred. However, the information charged defendant with murder, and it was unnecessary for the information to state the method or degree of the murder. (*People* v. *Golston*, 58 Cal.2d 535, 539 [25 Cal.Rptr. 83, 375 P.2d 51] ; *People* v. *Mendez*, 27 Cal.2d 20, 23-24 [161 P.2d 929].) That the statute of limitations may have run on all crimes except the murder is immaterial here.

■ Defendant argues that the court erred in instructing the jury regarding murder committed in the perpetration of or attempt to perpetrate robbery because the evidence assertedly did not warrant such instructions. ■ To establish a defendant's guilt of first degree murder on the theory that he committed the killing during the perpetration of, or attempt to perpetrate, robbery or one of the other felonies specified in Penal Code section 189 the prosecution must prove that the defendant specifically intended to commit one of the enumerated felonies. (*People* v. *Anderson*, 63 Cal.2d 351, 358 [46 Cal.Rptr. 763, 406 P.2d 43] ; *People* v. *Sears*, 62 Cal.2d 737, 744 [44 Cal.Rptr. 330, 401 P.2d 938] ; *People* v. *Craig*, 49 Cal.2d 313 [316 P.2d 947] ; *People* v. *Coefield*, 37 Cal.2d 865, 870 [236 P.2d 570].) ■ "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (Pen. Code, § 211.) " 'Presence depends upon the circumstances of each case and implies an area with no metes and bounds' " and "immediate" has been defined as " 'Being near at hand; not far apart or distant.' " (*People* v. *Bauer*, 241 Cal.App.2d 632, 642 [50 Cal.Rptr. 687] ; see also *People* v. *Hornes*, 168 Cal. App.2d 314, 320-321 [335 P.2d 756] ; *People* v. *Lavender*, 137 Cal.App. 582, 584 et seq. [31 P.2d 439] ; see Fricke, Cal. Criminal Law (9th ed.) pp. 306-307.)

■ As we have seen, there is substantial evidence, including, among other things, psychiatric testimony, that defendant was capable of forming an intent to rob, and the recited evidence also constitutes substantial proof that defendant intended to rob Gary of his automobile and killed him during an attempt to perpetrate that robbery. Accordingly, it was not error to instruct the jury regarding murder committed in an attempt to perpetrate robbery. Any error in instructing regarding murder committed in the perpetration of (as distinguished from an attempt to perpetrate) that offense was not prejudicial. (Cal. Const., art. VI. § 13 ; *People* v. *Watson*, 46 Cal.2d 818, 836-837 [299 P.2d 243].)

## 2. *Sufficiency of Evidence and Jury Instructions Regarding Wilful, Deliberate and Premeditated Murder*

 There is sufficient evidence to support a verdict based on the theory that defendant committed the murder during an attempt to perpetrate robbery. The case, however, was also tried on the theory that the killing was a wilful, deliberate, and premeditated murder, and it is necessary to consider the difficult question whether there is likewise substantial evidence supporting this theory. In the absence of such evidence, it was, of course, error to give instructions relating to this theory. (*People* v. *Anderson, supra,* 63 Cal.2d 351, 358-360.)

 "It has long been settled under the *Wells-Gorshen* rule of diminished capacity that in cases other than those where a felony murder is charged, a defendant cannot be convicted of murder of the first degree if, at the time of the alleged offense, he was operating under a mental disability not amounting to legal insanity that prevented him from acting with malice aforethought or with premeditation and deliberation." (*People* v. *Ford,* 65 Cal.2d 41, 54-55 [52 Cal.Rptr. 228, 416 P.2d 132]; see also *People* v. *Goedecke,* 65 Cal.2d 850, 855-858 [56 Cal.Rptr. 625, 423 P.2d 777, 22 A.L.R.3d 1213]; *People* v. *Nicolaus,* 65 Cal.2d 866, 876-878 [56 Cal.Rptr. 635, 423 P.2d 787].)

 The recited evidence including, among other things, the psychiatric testimony and proof of the circumstances surrounding the crime, is sufficient to support a finding that defendant committed the killing with malice aforethought. (Cf. *People* v. *Bassett,* 69 Cal.2d 122, 126 et seq. [70 Cal. Rptr. 193, 443 P.2d 777]; *People* v. *Goedecke, supra,* 65 Cal.2d 850, 852-858; *People* v. *Nicolaus, supra,* 65 Cal.2d 866, 869-878.)

We turn then to whether the evidence is also sufficient to support a finding that the murder was wilful, deliberate, and premeditated.

 "By conjoining the words 'willful, deliberate, and premeditated,' in its definition and limitation of the character of killings falling within murder of the first degree the Legislature apparently emphasized its intention to require as an element of such crime substantially more reflection than may be involved in the mere formation of a specific intent to kill. . . . Neither the statute nor the court undertakes to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent which is truly deliberate and premeditated. The

time would vary with different individuals and under different circumstances. The true test is not the duration of time as much as it is the *extent of the reflection.*'' (*People* v. *Wolff,* 61 Cal.2d 795, 821 [40 Cal.Rptr. 271, 394 P.2d 959]; *People* v. *Thomas,* 25 Cal.2d 880, 899-900 [156 P.2d 7].) *Wolff* further pointed out (at p. 820) that ''Dividing intentional homicides into murder and voluntary manslaughter was a recognition of the infirmity of human nature. Again *dividing the offense of murder into two degrees is a further recognition* of that infirmity and *of difference in the quantum of personal turpitude of the offenders. . . .*'' (See also *People* v. *Goedecke, supra,* 65 Cal.2d 850, 856-858; *People* v. *Nicolaus, supra,* 65 Cal.2d 866, 877-878.)

Here defendant had ample time to reflect upon the killing, and, as we have seen, although the testimony of the psychiatrists is in conflict, several psychiatrists were of the view that at the time of the killing defendant was not psychotic. Dr. Schnell who examined and observed defendant over extended periods of time, testified that defendant was able to premeditate and deliberate and that his capacity to do so would not be diminished below that of a normal person, and his testimony previously summarized indicates reasons for his conclusions.[3] There was evidence of a motive, namely robbery, and defendant's actions in carrying out the crime are, of course, additional proof of his then mental state. Also

[3]Defendant points to statements in two reports written by Dr. Schnell in July 1961 and December 1962, which are in the clerk's transcript. However, evidence of the statements was not introduced at the guilt trial. Moreover, the statements are not necessarily inconsistent with Dr. Schnell's testimony. In the 1961 report Dr. Schnell after diagnosing defendant as ''sociopathic personality disturbance, dissocial reaction,'' stated ''In my opinion, the prognosis for [defendant] is very poor, so far as considering him for return to society. However, from a standpoint from psychosis or serious neurosis, I don't believe that this man can be given a pathologic diagnosis at this time. . . . It will be necessary to keep this man for a further period of observation.'' In the December 1962 report, Dr. Schnell after diagnosing defendant as ''Personality pattern disturbance, schizoid personality,'' stated in part, ''It is very certain that [defendant] should never be returned to society because he has demonstrated that *he is completely unable to exercise judgment.* For one thing, he has always drunk heavily during the few times that he has been on parole for very short periods of time. He does have insight into his problem. He knows quite well what his problems are, but *is completely unable to regulate his behavior in society judiciously.*'' (Italics added.) By the italicized statements Dr. Schnell may not have meant literally that defendant lacks ability to exercise judgment and to regulate his behavior judiciously but rather may have meant that defendant does not exercise judgment or regulate his behavior judiciously. But even if the statements are interpreted literally, it is questionable whether Dr. Schnell meant defendant lacked such ability *at the time of the killing.*

lay witnesses who saw him within a brief time before and after the killing found his conversations responsive and noticed nothing unusual about his manner and conduct except that he spoke slowly. Uncontradicted evidence such as that he had been committed to Atascadero State Hospital over a year before the murder after being adjudicated insane did not preclude a finding that he maturely and meaningfully reflected upon the gravity of the crime, especially since after that commitment he was determined at Atascadero not to be psychotic, was released from the hospital and was subsequently placed on parole before the murder. Nor was such a finding precluded by the additional uncontradicted evidence that between two and three months after the killing he was again adjudicated presently insane and committed to Atascadero where he received electro-shock treatments, a repetition of treatments given him years before.

We are satisfied that there is substantial evidence from which the jury could find that defendant committed wilful, deliberate and premeditated murder. It thus was not error to instruct the jury regarding such a murder.

### 3. *Change of Venue*

On July 5, 1966, before the proceedings for the selection of the jury, defendant moved for a change of venue on the ground that as a result of an article in the July 3, 1966, Fresno Bee a fair trial could not be had in Fresno County. (See Pen. Code, § 1033.) He presented to the trial court the article, which sets forth, among other things, details of the crime, the history of the case including the verdicts rendered at the first trial, and various changes in the law that affected the case. The trial court denied the motion without prejudice to its being renewed.

On July 6, 1966, the selection of the jury began, and, although some prospective jurors had read the article, it does not appear that any members of the trial jury had done so. Defendant accepted the jury without exhausting his peremptory challenges and without renewing his motion for change of venue. Under the circumstances the trial court did not abuse its discretion in denying the motion before trial and did not err in failing to raise the question on its own motion thereafter. (Cf. *People* v. *Modesto;* 62 Cal.2d 436, 443 [42 Cal.Rptr. 417, 398 P.2d 753] ; see *People* v. *Duncan,* 53 Cal.2d 803, 812 [3 Cal.Rptr. 351, 350 P.2d 103].)

### 4. *Admission of Evidence and Giving of Instructions*

Before the trial the court ordered ''that, pursuant to stipu-

lation of counsel, the deposition of Dr. Paul Levy may be taken and said deposition be used in lieu of testimony at the trial."[4] The prosecution thereafter took Dr. Levy's deposition at which time defense counsel cross-examined him. At the trial the prosecution offered Dr. Levy's deposition in evidence, and defendant objected solely on the ground that it concerned his sanity and was therefore inadmissible at the guilt trial. The court overruled the objection because it determined that part of the deposition was relevant to the issues of guilt, but, at defendant's request, part of the deposition determined to concern solely the question of sanity was deleted. ██ Defendant now argues that it was error to admit any of the deposition and to give an instruction regarding it because, assertedly, the deposition was taken in violation of article I, section 13, of the California Constitution and section 1335 of the Penal Code.[5] However, since it was stipulated that Dr. Levy's deposition might be taken and used at the trial, it was not error to admit it. (Cf. *People* v. *Torres,* 201 Cal.App.2d 290, 295 [20 Cal.Rptr. 315]; *People* v. *Zavaleta,* 182 Cal.App.2d 422, 430 [6 Cal.Rptr. 166]; *People* v. *Mathews,* 163 Cal.App.2d 795, 801 [329 P.2d 983]; *People* v. *Grundell,* 75 Cal. 301 [17 P. 214].) Moreover, in the absence of the stipulation defendant could not raise the claim of error on appeal since it was not raised in the trial court. (Cf. *People* v. *Cockrell,* 63 Cal.2d 659, 667 [47 Cal.Rptr. 788, 408 P.2d 116]; *People* v. *Dement,* 48 Cal.2d 600, 604 [311 P.2d 505]; see Witkin, Cal. Evidence (2d ed. 1966) p. 1187 et seq.) Since the deposition was properly admitted, the court did not err in instructing the jury regarding it.

██ Defendant also contends that at the penalty trial it was error to admit evidence of attacks by him upon other inmates because it was irrelevant. Although error under *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, requires reversal of the death penalty, a matter discussed hereafter, it is appropriate to consider the instant contention for purposes of guiding the trial court upon retrial of the penalty.

---

[4]The prosecution stated that the parties so stipulated because Dr. Levy would be in Europe at the time of the trial.

[5]Article I, of section 13, provides, ". . . The Legislature shall have power to provide for the taking, in the presence of the party accused and his counsel, of depositions of witnesses in criminal cases, other than cases of homicide when there is reason to believe that the witness, from inability or other cause, will not attend at the trial."

Section 1335 provides, ". . . the people in cases other than those for which the punishment may be death, may, . . . have witnesses examined conditionally in . . . their behalf, as prescribed in this chapter."

Robert Scharton testified at the penalty trial that while he and one Butterfield were confined in jail with defendant in 1964 defendant hit and repeatedly stabbed Butterfield. Roy Pike testified that he was in jail in 1965 when he was 18, that he then suffered from dizzy spells and on one occasion passed out, and that when he came to defendant was standing over him with a pocket knife and forced him to submit to an act of sodomy. Pike further testified that in 1965 another inmate named Dennis, who had a broken leg, was attacked by defendant with that inmate's crutches and that defendant broke one crutch on the cast on the inmate's leg. Woodrow Perry testified that in 1965, while he was confined in jail, defendant threw a burning substance in Perry's eyes and kicked, beat and stabbed him, inflicting a wound requiring several stitches.

Evidence of a defendant's misconduct after the murder may be relevant to the issue of penalty. (*People* v. *Tahl,* 65 Cal.2d 719, 743 [56 Cal.Rptr. 318, 423 P.2d 246]; *People* v. *Mitchell,* 63 Cal.2d 805, 817 [48 Cal.Rptr. 371, 409 P.2d 211].) Here, as in *Tahl* and *Mitchell,* the jury is entitled to know that defendant was not revulsed by the murder he had committed but was willing to commit other acts of violence.

Robert Scharton also testified that, during his incarceration, defendant told him about the "kid he had . . . killed up at Avocado Lake, and how he did it, that he was happy he did it" and about the girl he hit with his gun. Defendant asserts that this testimony was irrelevant and should have been excluded. However, evidence that a defendant lacks remorse for his crimes is manifestly relevant to the issue of penalty.

### 5. *Excusing Veniremen Opposed to Capital Punishment*

Eight veniremen were excused on the ground of their opposition to the death penalty.[6] Under *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, it was error to exclude one or more of them. For example, the following occurred during the *voir dire* examination of Mrs. Fries. "THE COURT: . . . Can you think of anything that would cause you to be . . . other than a fair and impartial juror if you were to be selected? MRS. FRIES: Well, I don't know if I could possibly deal with the death sentence. I— THE COURT: . . . Do you hold such a conscientious opinion on the death penalty as would preclude you from concurring in a verdict carrying the death penalty? . . . MRS. FRIES: Well, probably. I don't feel I would

---

[6]Two prospective alternate jurors were likewise excused on that ground, but no alternates took the place of any of the jurors.

have the— THE COURT: Very well. Thank you, and you may be excused . . . ."

Mrs. Fries may well have understood the court's second question as asking whether she holds such a conscientious opinion on the death penalty as would preclude her from concurring in a death penalty verdict *in this case,* and so far as appears from her response ''probably'' and other remarks her conscientious opinion may have precluded her from concurring in such a verdict in the majority of cases but not have precluded her from concurring in such a verdict in all cases or in this case irrespective of the evidence that might be introduced at the trial. The court did not allow her to complete her answers, and her partial answers do not make it ''unmistakably clear'' that she ''would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial. . . .'' (*Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 522, fn. 21 [20 L.Ed.2d 776, 785].)

There is no merit to the Attorney General's claim that defendant's failure to object in the trial court to the exclusion of the veniremen bars the present claim of error. (*In re Anderson on Habeas Corpus* and *In re Saterfield on Habeas Corpus,* 69 Cal.2d 613, 619 [73 Cal.Rptr. 21, 447 P.2d 117].)

### 6. *Denial of Motion for New Trial and for Reduction of Degree of Offense and Modification of Punishment*

A further question presented, although not raised by defendant, is whether certain comments by the trial court show that it misinterpreted its duty in passing on defendant's motion for a new trial and for reduction of degree of offense and modification of punishment. Defendant made the motion on the ground that the verdict was contrary to law and evidence. (Pen. Code, § 1181, subd. 6.)

When it denied the motion the court stated, ''The Court has listened to the arguments and has reviewed with interest and consideration the Points and Authorities submitted by the defense in support of the Motion for New Trial, Reduction or Modification, as well as the Reply Brief of the People. Both are well done and of real benefit to a fair and just decision.

''Without citing authorities but with due regard to the precedent, this Court feels that the function of a trial judge is to assure a fair trial to the parties in the following particulars:

''First, that an impartial jury is selected; second, that only

legally admissible evidence is received; third, that attorneys on both sides conduct themselves according to the law in the trial of the case and finally, that the jury is fairly and impartially and correctly instructed on the principles of law which govern their deliberations in arriving at a verdict. In this case, these criteria have been met.

"Defendant's motion is based entirely on the proposition that the jury disregarded the weight of the evidence and accordingly, arrived at the wrong conclusion. With this contention the Court does not agree.

"If this had been a trial before the Court without a jury, it is probable, if not certain, that in view of the definite preponderance of the factual as well as psychiatric evidence of the Defendant's mental illness and diminished responsibility, this Court would have had a reasonable doubt as to the extent of the Defendant's guilt and accordingly, not have decreed the death penalty. This statement illustrates, in view of the ruling to follow, why the Anglo-Saxons selected trial by a jury of peers as the best means of achieving a consistent justice.

"This Defendant was tried before a fair and impartial jury. No illegal evidence was received during the trial. The attorneys conducted themselves according to law. The jury was fairly and impartially instructed as to the law by which they must be governed in arriving at their verdict.

"Under these circumstances, it is not for one man to substitute his judgment for twelve. The motions are denied."

 In *People* v. *Gorshen,* 51 Cal.2d 716, 734 [336 P.2d 492], which affirmed a second degree murder conviction, this court in rejecting a contention that remarks of the trial court showed that it was under a misapprehension regarding the law, stated in part, "In accord with the normal process of appellate review, we accept those statements which support the judgment as representing the court's final determinations, and interpret favorable to the judgment those statements which are susceptible of such interpretation." (See also *People* v. *Moore*, 257 Cal.App.2d 740, 747, fn. 8 [65 Cal.Rptr. 450]; *People* v. *Jennings,* 158 Cal.App.2d 159, 167-168 [322 P.2d 19].)

 Under that rule of appellate review, the trial court's statements here do not show that it misinterpreted its duty. At the outset the trial court stated that it had reviewed the authorities submitted by the defense, and those authorities included decisions such as *People* v. *Robarge,* 41 Cal.2d 628, 633 [262 P.2d 14], which clearly sets forth the trial court's

58

duty in passing on a motion for a new trial. *Robarge* states (at p. 633), ". . . While it is the exclusive province of the jury to find the facts, it is the duty of the trial court to see that this function is intelligently and justly performed, and in the exercise of its supervisory power over the verdict, the court, on motion for a new trial, should consider the probative force of the evidence and satisfy itself that the evidence as a whole is sufficient to sustain the verdict. [Citations.] It has been stated that a defendant is entitled to two decisions on the evidence, one by the jury and the other by the court on motion for a new trial. [Citations.] This does not mean, however, that the court should disregard the verdict or that it should decide what result it would have reached if the case had been tried without a jury, but instead that it should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict. [Citations.]"

 Since the court reviewed defendant's authorities, it cannot be assumed that when it stated that it felt its function was to assure a fair trial to the parties in specified particulars, it meant that it believed its function was limited to those particulars. The court's statement that it did not agree with the contention that the jury disregarded the weight of the evidence and arrived at the wrong conclusion is a further indication that it was aware of its duty in passing upon the motion to weigh the evidence and determine whether there was sufficient credible evidence to support the verdict.

The court's statement referring to "the preponderance of the . . . evidence of the Defendant's . . . diminished responsibility," cannot be accepted as the court's final determination regarding the weight of the evidence, but rather we must accept the court's statements indicating that the weight of the evidence supported the verdict and that justice had been achieved as the court's final determination. And the court's conclusion that "Under these circumstances, it is not for one man to substitute his judgment for twelve," in the light of the entire remarks, may reasonably be interpreted as meaning that he would not put his judgment in place of the jury's because his final judgment was the same as that of the jury.

The judgment is reversed insofar as it relates to penalty; in all other respects it is affirmed.

Traynor, C. J., Mosk, J., and Sullivan, J., concurred.

McCOMB, J.—I dissent. I would affirm the judgment in its entirety.

PETERS, J.—I agree that the judgment of guilt must be affirmed, and that the judgment of death must be reversed. But, it is my opinion, under the facts stated in the majority opinion, this court should exercise the discretionary power, conferred by section 1181, subdivision 7 of the Penal Code, to reduce the penalty to life imprisonment. But this is not a proper case in which to now discuss that point, at length. The power granted by that subdivision has apparently never been exercised by an appellate court, and there is a major difference of opinion among the members of this court as to the proper interpretation and application of that subdivision. Inasmuch as four members of this court are not now willing to exercise the power apparently granted by that subdivision, since the point has not been briefed, since in any event the penalty is being reversed, and because the new trial may result in a life imprisonment verdict so that the point involved may become moot, the consideration of this point may now properly be deferred.

Another point should be mentioned. Inevitably involved in this and all other death penalty cases, is the constitutionality of the procedures adopted in California for the imposition of the death penalty. This issue was argued at length in *In re Anderson* and *Saterfield,* 69 Cal.2d 613 [73 Cal.Rptr. 21, 447 P.2d 117[. There this court, by a four-to-three majority, held that the death penalty procedures adopted in California were constitutional. I disagree with that conclusion, and in the instant case would hold the death penalty procedures adopted in California to be unconstitutional, for the many reasons so clearly expressed by Mr. Justice Tobriner in his dissent in the *Anderson* and *Saterfield* case. But unless or until at least four members of this court rule to the contrary, or unless or until the United States Supreme Court overrules the majority of this court, I am bound by the majority rule announced in that case. Solely under compulsion of the majority rule adopted in that case, it must be held, in the instant case, that the death penalty procedures adopted in California are constitutional.

TOBRINER, J.—I agree that the judgment of guilt must be affirmed, and that the judgment of death must be reversed.

I concur, however, in the following language of the concur-

ring opinion of Peters, J.: "Inevitably involved in this and all other death penalty cases, is the constitutionality of the procedures adopted in California for the imposition of the death penalty. This issue was argued at length in *In re Anderson* and *Saterfield*, 69 Cal.2d 613 [73 Cal.Rptr. 21, 447 P.2d 117]. There this court, by a four-to-three majority, held that the death penalty procedures adopted in California were constitutional. I disagree with that conclusion, and in the instant case would hold the death penalty procedures adopted in California to be unconstitutional, for the many reasons so clearly expressed by Mr. Justice Tobriner in his dissent in the *Anderson* and *Saterfield* case. But unless or until at least four members of this court rule to the contrary, or unless or until the United States Supreme Court overrules the majority of this court, I am bound by the majority rule announced in that case. Solely under compulsion of the majority rule adopted in that case, it must be held, in the instant case, that the death penalty procedures adopted in California are constitutional."

Traynor, C. J., concurred.