[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION[1]
The commissioner of children and families (commissioner) brought this petition alleging that the child, Damien G., age nineteen months, was neglected and uncared for.[2] The "order for hearing" accompanying the petition "ORDERED, that said petition be heard and determined at Superior Court — Juvenile Matters 784 Fairfield Avenue, Bridgeport, Ct. on the 22nd day of June A.D. 1994 at 10:45 o'clock in the fore noon." According to the deputy sheriff's return of service, and in accordance with the summons, the respondent mother, Donna G., was served with the petition in hand.
On June 22, 1994 at 11:10 A.M. the case was called in court. The respondent was not present. Based on the allegations in the petition, the accompanying "summary of facts" and the social study which was marked as an exhibit, the court ordered that the child be committed to the care and custody of the commissioner.
At 2:35 P.M. that day, the respondent arrived in court. The court recalled the matter and advised the respondent of her rights, including her right to a court-appointed lawyer and her right to remain silent.2* The respondent stated that she did need time to obtain a lawyer. Upon inquiry by the respondent, the court, notwithstanding the respondent's interruptions, attempted to explain to the respondent the meaning of the term "child with `specialized needs'". See footnote 1, supra; In re Kelly S.,29 Conn. App. 600, 612-613, 616 A.2d 1161 (1992). The respondent agreed to a request by the assistant attorney general representing the commissioner that the case worker from the Department of Children and Families go to the respondent's apartment to interview the respondent and examine the child. The respondent volunteered that "I do have a friend of mine that said if push comes to shove, that she would take the baby. Temporarily take the baby." The court stayed its prior order committing the child to the commissioner and continued the matter for one day.
The following day, Thursday, the parties returned to court. The respondent was present with her child. An attorney had not yet been assigned to represent the respondent. The respondent appeared to have beaten about the face. Upon inquiry by the court, the CT Page 9236 respondent represented that she "got jumped. They tried to rob me." The assistant attorney general requested that the court issue an order of temporary custody to the commissioner. Because of the court's perception that a struggle would ensue in which the child might be injured,[3] the court recessed until additional security could be obtained in the courtroom. Upon reconvening, the court ordered that temporary custody of the child be given to the Department of Children and Families until the following week when the parties were ordered to return to court.
On Tuesday June 28, 1994, the parties did return to court. The respondent now was represented by counsel. The assistant attorney general representing the Department of Children and Families renewed his request for an order of temporary custody. He also advised that there was "more than one social worker" present and available to be examined. Counsel for the respondent was heard at length and argued that no grounds existed for the issuance of an order of temporary custody. Although she did not dispute that the children had not received their vaccinations, she specifically argued that nothing in the law "suggests that parents who fall behind in immunizations could stand to lose their children." At no time did the respondent seek to offer testimony or to examine the social workers who were present. At the conclusion of the hearing, the court affirmed its prior order granting temporary custody of the child to the Department of Children and Families.
The petition, the allegations of which are made under oath, alleges "1. Said child is denied proper care physically, emotionally, and morally. 2. Said child is permitted to live under conditions, circumstances, or associations injurious to his well being. TO WIT: On December 18, 1993, child was discovered in home alone without adult supervision. On April 13, 1994, child was again found alone and unsupervised by the Department of Children and Families staff. Child has been denied specialized care due to drug exposure at birth. Mother also missed last scheduled doctor's appointment for child's shots." The petition was signed by Judith Grossner as the "duly authorized agent" of the commissioner of children and families.
Accompanying the petition was the required "Summary of Facts" Practice Book § 1040.1(2) provides that "[a] summary of the facts substantiating the allegations of the petition shall be attached thereto and shall be incorporated by reference." (Emphasis added.) Unquestionably, the rules of practice are laws and have the force of law. Steadwell v. Warden, 186 Conn. 153, CT Page 9237 163-164, 439 A.2d 1078 (1982) (Shea, J., dissenting, with Wright, J., concurring in the dissent). Since the summary of facts is incorporated by operation of law into the petition which is under oath, the summary of facts, although only signed at the end by the commissioner's representatives, is virtually, if not actually, under oath. Cf. State v. Williams, 203 Conn. 159, 169,523 A.2d 1284 (1987).
The summary of facts, which was credited by the court, states that "[p]rior to [the respondent's] involvement with the Department of Children and Families with Damien . . . she had three other biological children in her custody. These children are no longer living with her. On September 18, 1990, Melody T[.] (DOB: 1/6/84), William T[.] (DOB: 1/28/85) and Gabrielle G[.] DOB: 9/12/89), were voluntarily placed with maternal grandmother, Barbara R[.] of . . . Milford, Connecticut. In January of 1993 a Removal of Guardianship was filed and granted by Milford probate court. . . . Mrs. R[.] was appointed guardian.
"This families [sic] case was opened in October of 1989. From October of 1989 to September of 1991, there were twelve referrals made on these three children. Five referrals came from the children's schools. These reports state the children were unkempt[;] on one occasion one of the children had lice and had to be removed from school. Another report, William T[.] complained to his teacher his head was hurting. Child stated that mother hit him in the head with a base ball bat. School nurse noted two small open areas on his head. A referral from Bridgeport Hospital that Gabrielle was [sic]. Referral from school on October 13, 1992 that Melody came to school with multiple bee stings on her face and her eyes were swollen red, she also came barefoot." While these observations alone obviously do not warrant an order of temporary custody with respect to Damien, they nonetheless are a relevant backdrop to the allegations which do. "`We cannot as judges be ignorant of that which is common knowledge to all men [sic].'Sherrer v. Sherrer, 334 U.S. 343, 366." Utica Mutual Ins. Co. v.Cotter, 26 Conn. Sup. 419, 423 (Super 1966) (Parskey, J.).
The commissioner's summary of facts states: "On August 13, 1992, The Department of Children and Families received a referral from Bridgeport Hospital after Miss Donna G[.] gave birth to a seven pound, nine ounce boy. The infant tested positive for cocaine. The infant received no prenatal care during pregnancy.
"On October 6, 1993, a referral was received from Bridgeport CT Page 9238 Hospital. Donna was being treated at Bridgeport Hospital for a recent miscarriage and there was no one to stay with Damien. A primary was dispatched from the hospital to get the child at home. Mother voluntarily placed child in foster care.
"On December 8, 1993, a referral from an anonymous caller that Damien G[.] was home alone and unsupervised. Social Worker Kathy Russell went out to investigate, this was confirmed. During the investigation Miss G[.] returned to the home and became very belligerent with worker. She threatened worker and chased her down the steps attempting to punch worker. Social Worker filed a police report as well as an interoffice critical incident report. Case was transferred to present worker.
"In January of 1994 a referral was made to the Ripple Program. Damien was born drug addicted and should have an evaluation determining any specialized needs. An appointment was [s]cheduled for March 7, 1994. Miss G[.] was non-compliant [sic] and did not attend appointment.
"On April 13, 1994, Social Worker made an unscheduled home visit to 565 Stillman Street. A woman was standing in front of the house and stated that [Miss G.] was not home and that she had gone out to get pampers. Worker stated that she would just leave a note at her door on the third floor. Woman repeated that [Miss G.] was not home. Worker was at [Miss G.'s] door for approximately five minutes when [Miss G.] came up the stairs with the other woman. [Miss G.] let worker inside. Twenty month old Damien was in the apartment alone and unsupervised. [Miss G.] claimed that her friend was watching Damien. Worker explained that the woman was three stories downstairs and outside the house and not supervising the child who was alone in the apartment.
"[O]n April 15, 1994, Social Worker made a scheduled home visit with Parent Aide, Latonya Browning. When worker arrived [Miss G.] was found to be sleeping. Damien was on the couch, awake, but without any diapers on. Worker asked [Miss G.] if she had diapers. She showed worker a bag of diapers, but said she wasn't going to put them on. Damien was unclothed for the hour long visit that Social Worker was there. Child was crawling on the very soiled wood floors.
"On April 19, 1994, Social Worker spoke with Bridgeport Hospital Pediatric Clinic's Nurse, Yvonne Wilkins. She advised that Damien was extremely delayed with his immunizations. She CT Page 9239 stated that he has not been seen since his six month check up. Damien needs: 3rd DPT, 4th DPT, MMR (Measles, Mumps, and Rubella), Tine Test, HIB Test (needed at fifteen months), Polio (needed at eighteen months). An appointment was made for April 28, 1993. Mother failed to keep appointment." Two weeks later, on May 4, 1994, the duly authorized agent of the commissioner signed the petition which commenced this proceeding.
The statutory authority for the Superior Court to order that temporary custody of a child vest in the department of Children and Youth Services during the pendency of a neglect petition is found in General Statutes § 46b-129(b). That statute provides in relevant part: "If it appears from the allegations of the petition and other verified affirmations of fact accompanying the petition, or subsequent thereto, that there is reasonable cause to find that the child's or youth's condition or the circumstances surrounding his care require that his custody be immediately assumed to safeguard his welfare, the court shall either (1) issue an order to the parents or other person having responsibility for the care of the child or youth to show cause at such time as the court may designate why the court shall not vest in some suitable agency or person the child's or youth's temporary care and custody pending a hearing on the petition, or (2) vest in some suitable agency or person the child's or youth's temporary care and custody pending a hearing upon the petition which shall be held within ten days from the issuance of such order on the need for such temporary care and custody." Despite the language of this statute, the Supreme Court of the State of Connecticut, over ten years ago, held that the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States required that a court could only grant an order of temporary custody if the same standard by which the agency could ex parte remove the child from the home for ninety-six hours without a parent's consent, pursuant to General Statutes § 17a-101(e), was satisfied.[4] In re Juvenile Appeal(83-CD), 189 Conn. 276, 288-289, 455 A.2d 1313 (1983). That is, an order of temporary custody "is permitted only where `serious physical illness or serious physical injury' is found or where `immediate physical danger is present." Id., 287.[5] The court granted the request for an order of temporary custody to the commissioner of children and families based on its finding that the infant child was in immediate physical danger. This finding, in turn, was based on subordinate findings that the respondent mother, in the recent past, had been removed as guardian of three other children, that this child was living in unsanitary conditions, that the respondent she was not supervising the baby, CT Page 9240 and that she had neglected to have her son inoculated against diseases which, to an infant such as this, could be life threatening. While there may be cases in which none of these circumstances, standing alone, would warrant the issuance of an order of temporary custody, here they must be viewed together, and in the full context in which they arose, in order to reflect the reality of the case.
The direct evidence before the court and inferences therefrom establish that the child was born on August 13, 1992 testing positive for cocaine and addicted to that lethal drug. In December 1993, the respondent was removed by the Probate Court as guardian of three other children ages nine, eight and four. The mother is a cocaine addict but remains in denial. She has been belligerent to investigating social workers from the department of Children and Families and has failed to cooperate with the Ripple Program. The home is in an unsanitary condition. The infant is often left unsupervised. He has not had inoculations for "MMR"[6], polio, his third or fourth "DPT"[7], nor has he had a Tine Test[8] or HIB test.[9] After the social worker learned of these defaults by the mother an appointment was made for the child to have inoculations on April 28, 1993. The mother failed to keep that appointment.
Unscheduled visits to the respondent's home on December 8, 1993, when Damien was sixteen moths, and on April 13, 1994, when Damien was twenty months, confirmed that the infant was home alone and unsupervised. While no known person kept a continual surveillance on the respondent, "[c]ourts must necessarily rely on circumstantial evidence in many cases and may draw reasonable and logical inferences from facts existing prior to or subsequent to an event for the purpose of reaching a conclusion of fact."Shaughnessy v. Morrison, 116 Conn. 661, 664, 165 A. 553 (1933). "The law does not distinguish between direct and circumstantial evidence as far as probative force is concerned." In re JuvenileAppeal (85-2), 3 Conn. App. 184, 193, 485 A.2d 1362 (1985). The revelations made during the unscheduled visits to the respondent's home, together with the other facts surrounding the respondent's life, especially her severe drug addiction, persuades the court that it was not uncommon for the respondent to leave her infant son home alone. Such reckless disregard for a child of such tender years exposed him to immediate physical danger. "Immediate" is not synonymous with instantaneous; State ex rel. Lipovsky v. Kizak,15 Ohio St.2d 27, 238 N.E.2d 777, 779 (1968); Olson v. Ross,
82 N.Y.S.2d 49, 51 (Sup. 1948); Eckberg v. Belfer, 222 Minn. 450,24 N.W.2d 851, 852 (1946); but, rather, means at hand, not distant or CT Page 9241 far apart; People v. Risenhoover, 70 Cal.2d 39, 73 Cal.Rptr. 533,540, 447 P.2d 925 (1968); or within a reasonable time. See cases collected in 20 Words and Phrases (West), pp. 127-132. "Danger" is defined as "exposure or liability to injury, pain, harm or loss." Webster's Ninth New Collegiate Dictionary (1991); Redgate v.Doyle, 123 Conn. 291, 294, 195 A. 196, 198 (1937). Thus, it is not necessary that the physical harm itself have occurred; TexasDepartment of Human Services v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987); or be certain to occur within a particular period of time. Rather, it is the immediacy of the exposure or liability to physical harm which warrants an order of temporary custody. Repeatedly leaving a child of such tender years home alone clearly rises to the level of immediate physical danger to the child, warranting an order of temporary custody. Parker v. Monroe CountyDepartment of Public Welfare, 533 N.E.2d 177 (Ind.App. 1989); ReA.D., 143 Vt. 432, 467 A.2d 121 (1983).
The respondent's drug addiction also is a proper factor to consider in determining whether to issue an order of temporary custody. Nassau County Department of Social Services v. LaquettaH., 191 App. Div. 2d 567, 595 N.Y.S.2d 97-98 (1993); Parker v.Monroe County Department of Public Welfare, supra, 553 N.E.2d 178;Newton v. Burgin, 363 F. Sup. 782 (W.D.N.C. 1973), affd., 414 U.S. 1139,94 S.Ct. 889, 39 L.Ed.2d 96 (1974). So too is the unsanitary condition of the home; Re A.D., supra; as is the respondent's uncooperative and combative attitude. Parker v. Monroe CountyDepartment of Public Welfare, supra. Nor is the court required to ignore that the respondent had so recently been removed by the Probate court as guardian of her three other children. NassauCounty Department of Social Services v. Laquetta H., supra.
Moreover, the respondent's persistent failure to have her son inoculated against dangerous childhood diseases warrants an order vesting temporary custody of the child with the commissioner.Matter of Richard W., 174 App. Div. 2d 821, 570 N.Y.S.2d 708 (1991); cf. In re Raymond G., 230 Cal.App.3d 964, 281 Cal.Rptr. 625 (1991). General Statutes § 19a-7f provides that "[t]he standard of care for immunization for the children of this state shall be the recommended schedule for active immunization for normal infants and children published by the committee on infectious diseases of the American Academy of Pediatrics or the schedule published by the National Immunization Practices Advisory Committee, as determined by the commissioner of health services."[10] The court may take judicial notice of recommended schedule for active immunization for normal infants and children published by the CT Page 9242 committee on infectious diseases of the American Academy of Pediatrics and the schedule published by the National Immunization Practices Advisory Committee; DeLuca v. Park Commissioners,94 Conn. 7, 9-10, 107 A. 611 (1919); especially since those publications are referenced in a general statute. See generally McCormick on Evidence (3d Ed.) § 331; cf. Browning-Ferris Industriesof South Jersey v. Muszynski, 899 F.2d 151, 161 (2d Cir. 1990); Fed.R.Ev. 201(b), (f). Under either schedule, the required inoculations should have been completed by the child's eighteenth month.[11]
The court also may take judicial notice of the nature of the childhood diseases for which the respondent has failed to have her child immunized. State v. Racskowski, 86 Conn. 677, 684, 86 A. 606
(1913); Gould v. Gould, 78 Conn. 241, 244, 50 A. 737 (1905); Statev. Main, 69 Conn. 123, 135, 37 A. 80 (1897). Diphtheria is "a severe disease, easily transmitted to others. . . . It was until a few years ago an important hazard to life and health, especially for children, but modern preventive and curative methods have almost completely eliminated it." (Emphasis added.) 1 Schmidt's Attorneys' Dictionary of Medicine, p. D-146. The disease is marked by fever and the formation of a layer of membrane in the throat which, along with swelling, "often interferes with breathing, and death as a result of suffocation may follow." Schmidt's, op.cit.
Pertussis, also known as whooping cough; 3 Schmidt's, op.cit, p. P-142; is "[a]n infectious disease, affecting mostly children, characterized by the symptoms of a head and chest cold, fever, and attacks of coughing ending in a peculiar whooping inspiration, i.e., inhalation. . . . [The cough] consists of a deep inhalation of air followed by a series of short coughs, without inhalation, until all the air is expired. Since breathing is suspended during the . . . attack, the child is in effect suffocating. His face becomes blue, the eyes bulging and red, and the veins in the neck are distended. Finally, the attack ends with a hungry and prolonged inhalation of air, accompanied by a shrill, whooping sound, caused by a partial closing of the opening to the windpipe. The cough often brings on vomiting. The number of such attacks of coughing varies from ten to twenty or more in twenty-four hours. The violent stage persists for about three to four weeks, then begins to subside." 4 Schmidt's, op.cit., pp. W-22 — W-23.
Tetanus is "[a]n infectious disease of sudden onset caused by the toxin or poison of the microorganism called Clostridiumtetani. It is characterized by painful spasms of various muscles, CT Page 9243 especially of the mouth and back, and by convulsions. The organism causing he disease is introduced into the body through some kind of wound. . . . The toxin affects the central nervous system." 4 Schmidt's, op.cit., p. T-50.
Measles and mumps are not serious diseases in themselves. However, mumps can result in sterility if other parts of the body are involved. 2 Schmidt's, op.cit., p. M-184 — M-185. Measles can result in complications such as bronchitis, pneumonia, and encephalitis; 2 Schmidt's, op.cit., p. M-48; which could be permanently debilitating or even fatal to a young child. Rubella, also known as German measles; 3 Schmidt's, op.cit., p. R-140; is a relatively mild disease similar to measles. However, if it is transmitted to a pregnant woman, it may do damage to an unborn child. 2 Schmidt's, op. cit., p. G-41.
Tuberculosis is a chronic and infectious disease caused by infection with bacteria. The disease frequently attacks the lungs. 4 Schmidt's, op. cit., p. T-192. Our own case law reflects that it may result in disability; Smith v. State, 138 Conn. 620,88 A.2d 117 (1952); and can even cause death. Niedzwicki v. PequonnockFoundry, 133 Conn. 78, 80, 48 A.2d 369 (1946). Polio, or poliomyelitis, is a disease marked by the inflammation of the spinal cord and caused by virus. "Because the parts of the spinal cord involved in the infection give rise to the nerves controlling the muscles of the arms and legs, the destruction of these portions of the spinal cord is followed by paralysis of the muscles and their subsequent wasting away. A muscle deprived of its nerve tends to atrophy. . . . The invasion of the virus does not always stop in the spinal cord; sometimes the infection goes up high enough to affect certain nerve structures . . . controlling the muscles whose movements are in breathing. This type of poliomyelitis . . . causes paralysis of the breathing mechanism." 3 Schmidt's, op. cit., p. P-249. It is common knowledge that in the first half of the present century, many parents lived in fear that this dreaded disease would strike their young children.
The respondent's failure to supervise her child, her failure to have him timely vaccinated against dangerous childhood diseases, and the filthy condition of the home establish that the child was in immediate physical danger. More, that the respondent was a cocaine addict, that the child had been born with no prenatal care and testing positive for cocaine, that the respondent had recently been removed as guardian of three other CT Page 9244 children and that she was combative and resistant to services, circumstantially establish that this danger had existed for a considerable period of time and would continue unless the child were removed from her custody. "[T]he court need not wait until a tradgedy [sic] occurs or the children are irretrievably ruined by a parent who is out of control in order to take action." Parker v.Department of Public Welfare, supra, 533 N.E.2d 179.
Bruce L. Levin Judge of the Superior Court