Filed 10/2/24  P. v. Stephens CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>ROBERT AARON STEPHENS,<br><br>　　　　Defendant and Appellant. | B327056<br><br>(Los Angeles County<br>Super. Ct. No. BA381235) |

APPEAL from an order of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Affirmed in part, reversed in part, and remanded.

Kravis, Graham & Zucker and Randy S. Kravis for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Supervising

Deputy Attorney General, and Michael J. Wise, Deputy Attorney General, for Plaintiff and Respondent.

Defendant and appellant Robert Aaron Stephens (defendant) was convicted of six sex offenses in connection with his rape of two women: M.V. in 2009, and T.C. in 2010. The trial court sentenced him to 22 years in prison. We consider defendant's various challenges to the judgment of conviction: whether the trial court erred in denying his new trial motion because the court did not understand its obligation to independently evaluate the sufficiency of the evidence, whether the trial court erred in instructing the jury on adoptive admissions in connection with "pretext calls" M.V. made to defendant at the behest of an investigating detective, whether the trial court should have sua sponte given a lesser included offense instruction on simple assault in connection with defendant's conviction for assault likely to cause great bodily injury, and whether there was insufficient evidence of penile penetration of T.C.'s anus to support defendant's forcible sodomy conviction.

## I. BACKGROUND

A. *The Offense Conduct Pertaining to M.V., As Established by the Evidence at Trial*

M.V. met defendant in an acting class in April 2009. The two were friendly and had a few interactions outside of class. Male students often walked female students back to their cars after class to ensure their safety, and defendant walked M.V. to her car once. They chatted about politics. On one occasion, defendant asked M.V. to get yogurt with him in her neighborhood. She agreed, but she did not think the outing was a date.

About one month after she joined the acting class, M.V. and defendant were assigned to be scene partners. This meant they

3

were expected to meet off-site once or twice during the week to prepare a scene from a movie and then perform it during class. M.V. and defendant met twice to rehearse their scene, once at his apartment and once at hers. When M.V. and defendant rehearsed at his apartment, he was not very interested in rehearsing and wanted M.V. to watch a movie with him instead. At some point, defendant tried to rub his leg against hers. She told defendant she was there to rehearse, not watch a movie, and did not stay very long. M.V. believed her actions clearly signaled she was not interested in dating defendant. When they met to rehearse at her apartment, they did some work on the scene but defendant primarily wanted to sit on the couch and talk to M.V., which she felt was a waste of time.

Later, defendant invited M.V. to a networking event taking place in the evening on May 21, 2009, which he told her was being held by the Creative Artist Agency. M.V. was trying to make a career as an actress, was having some success, and thought defendant invited her to the event to make up for not taking their rehearsals seriously. M.V. told Adam Church (Church), a close friend she had dated off and on for several years, that she was attending the event.[1] Church was watching M.V.'s dog for her, and M.V. told Church she would be back to pick up the dog by midnight.

M.V. wanted to meet defendant at the event, but defendant told her the event was close to his home and insisted they meet there. M.V. arrived at defendant's home around 8 or 9 p.m.

---

[1] Church maintained he and M.V. were not dating in May of 2009; M.V. was uncertain about the exact nature of their relationship at the time.

4

There was no street parking available, so M.V. called defendant and he told her to park in his garage.  Before leaving for the event, defendant and M.V. each had a shot of peppermint schnapps.

When M.V. and defendant got in his car to leave, M.V. told defendant she was not feeling 100 percent well.  Defendant offered to get her something, returned to the house, and brought her what he stated was an Ultram pill.  Defendant gave M.V. half of a pill, and took a whole pill himself.  Defendant also placed several other pills in his coat pocket.  M.V. asked him if he was a pill popper and jokingly asked if that was his drug of choice.  Defendant, also somewhat jokingly, said no, pulled a bottle out of his pocket, and said that was his drug of choice.  The bottle appeared to be a 5-Hour Energy drink bottle, but defendant told M.V. it was "liquid G."[2]

When defendant and M.V. arrived at the event, it was around 9:00 or 9:30 p.m.  It did not appear to M.V to be a CAA networking event; instead, they arrived at a home in Hollywood that had been converted into an art gallery.  M.V. thought she still might meet someone in the industry, so she decided to stay.  Soon after they arrived, M.V. obtained a mixed drink from a bartender.  She drank it in less than an hour.  After finishing it, she felt a "little buzz," which she considered typical based on the amount of alcohol she had consumed.

After finishing her first drink, M.V. went to the bathroom.  When she returned, defendant brought her a bottle of water.  M.V. was not paying attention and did not notice if the bottle was

---

[2]     This was an apparent reference to GHB, or gamma-hydroxybutyrate.

already open when he handed it to her.[3]  M.V. consumed about half of the bottle right away.  After she drank the water, M.V. began to feel more intoxicated.  Around the same time, M.V. and defendant went back to the bar and M.V. obtained another mixed drink from the bartender.  M.V. consumed half of the drink, at most.

After that, M.V. began to feel very intoxicated and she finished drinking the bottle of water defendant had given her.  She was feeling much more intoxicated than she normally would.  The two continued mingling at the party, but M.V.'s memory from that point on was fuzzy and blurry.

Sometime later, defendant and M.V. left the party.  M.V. did not remember getting in defendant's car, but she did remember being in the car while feeling "out of it."  Her next memory was of being in a house near the beach somewhere.  She recalled sitting on a sofa talking to a woman and hearing other people talking in another room.  M.V. described her memory of the evening as having long periods blacked out, and then remembering something very clearly.  M.V. remembered walking down the street to defendant's car while holding onto his arm because she was not able to walk particularly well, but she did not recall when during the course of the night that occurred.  M.V. did not remember anything else until the next morning.

Sometime between 10:00 p.m. and midnight, M.V. sent multiple text messages to Church in which she asked about her

---

[3]      According to Marc Caldera (Caldera), a friend of defendant's, he and defendant obtained three water bottles from a bartender, one of which was for M.V., and the bottles were sealed closed when they obtained them.

6

dog and asked whether Church was still working.  Church also received a call from M.V. around 1:15 a.m.  When they spoke, she sounded discombobulated, could not form a coherent sentence, and was speaking gibberish.  Church texted and called M.V. a number of times after that, but he was unable to connect with her until later that morning.

M.V. awoke at around 6:45 a.m., saw defendant was lying next to her, and realized she was in his bed.  M.V. was wearing a man's t-shirt and boxers, which she assumed belonged to defendant.  Her own clothes were on the floor.  M.V. got up and went into the bathroom.  She felt groggy, confused, and scared because she had not intended to stay the night and did not know how she got there.  M.V. went to the toilet and urinated.  She felt a burning sensation when she did so, which made her wonder if she had sex the night before.  She did not remember doing so.

M.V. left the bathroom, retrieved her purse, walked outside, and called Church.  Church answered the phone and they spoke for a few minutes.  M.V. told Church she was "freaked out" and was at defendant's home.  When Church asked what happened the night before, M.V. said she did not remember.  Church encouraged her to leave and asked if she wanted him to pick her up.  M.V. said not to worry, she would be leaving right away, and she just needed defendant to move his car, which was blocking hers.

M.V. went back inside.  Defendant, who was waking up, said he was surprised M.V. was awake and that he would have bet she would be out for 12 hours.  M.V., upset, asked him what happened the night before.  Defendant responded he was not going to tell her anything she did not want to hear.  M.V., crying and distraught, sat down on the bed and began running her

hands through her hair. Her hair came out in clumps, which made her cry more. She asked defendant what happened to her hair. He said her body was detoxing from drinking alcohol.

Shortly thereafter, defendant became upset and started crying and raising his voice. He removed his glasses, threw them against the wall, and then said, "Look what you've made me do." Defendant told M.V. he cared about her more than anyone other than his parents, that she had upset him, and that she was not allowed to leave until she made him feel better.

Defendant got on top of M.V. and pushed her down on the bed. He straddled her, put his hands on her throat, squeezed her throat intensely to the point her vision completely blacked out, and started kissing her aggressively.[4] M.V. did not kiss defendant back, and at some point he stopped kissing her and pulled his hands off her neck. Her vision fully returned, and she asked defendant why he did that. He responded that she liked it the night before. Defendant also pulled her hair at some point during the morning.

Although M.V. was scared, she decided to "play it cool" and stop crying because she didn't want defendant to do anything worse to her. Defendant got off of M.V. and said he wanted to have breakfast and talk.

When M.V. entered the kitchen, defendant was making breakfast and did not try to talk to her. M.V. took a piece of toast

---

[4] At defendant's later criminal trial, M.V. described it this way: "[Defendant] was squeezing my throat very much and not letting up at all, to the point that I lost—I was, like, losing consciousness. Like, I completely blacked out. I didn't, like, go unconscious, but my—my vision went, like, slowly black, and then it went all black."

8

from the toaster.  There was no furniture in the kitchen, and nowhere to sit.  Defendant took his breakfast back to his bedroom.  M.V. followed.  Defendant sat on his bed, turned on the TV, and ate breakfast.  M.V. then asked him to move his car a number of times, but he said he would not move the car until she assured him she was okay and made him feel better.

In the midst of eating breakfast, defendant again got on top of M.V. and kissed her while squeezing her neck with his hands.  M.V. held her breath and did not lose consciousness.  Defendant then stopped and resumed eating.  Defendant asked M.V. if she was okay, asked if she was going to say anything, told her not to cry, and told her he cared about her.  M.V. said she was cool and she was not going to say anything because she just wanted to leave.

After defendant finished breakfast, he again got on top of M.V., squeezed her neck, and kissed her aggressively.  Eventually, M.V. made defendant feel like she was okay, and he moved his car so she could drive away.[5]

While in the car, M.V. called Church to let him know she had finally left defendant's home and was driving to see Church.  M.V. still felt hazy, so she drove on surface roads and stopped a number of times to pull over and cry.  After she was about ten blocks from defendant's home, M.V. called him.  She asked defendant if he had used a condom.  He said, "of course."  This confirmed M.V.'s "worst fears."  She had not wanted to have sex

---

[5]    M.V. considered calling Church to pick her up, calling 911, or running out of the apartment, but she did not do any of those things because she was terrified defendant would stop her if she tried.

with defendant, and had not done or said anything that suggested otherwise.

### B. M.V.'s Rape Report and Subsequent Police Investigation

M.V. arrived at Church's residence approximately an hour after she left defendant's home. Church observed M.V. was disheveled and had bruises on the front of her neck. M.V. told Church what defendant had done, and Church encouraged her to call the police. M.V. did not call the police right away, however, because she was mortified and did not want anyone to know what happened.

M.V. first called a rape crisis hotline. The crisis hotline directed her to a location in Downtown Los Angeles. She told the receptionist she thought she had been raped the night before and the receptionist asked if she had filed a police report. M.V. said she had not and did not want to do so. M.V. then went to an urgent care facility, hoping they would test her for STDs. The personnel informed her that if she thought a crime had occurred, she needed to file a police report.

The next day, M.V. called her acting teacher and said she could not be defendant's scene partner any longer. After disclosing what defendant had done, the teacher convinced M.V. she needed to go to the police. Church later took M.V. to a police station where she reported the rape and the police escorted M.V. to a rape treatment center, where she was examined and treated.

A sexual assault nurse examiner found M.V. had abrasions on the back of her neck, bruises on her thighs and on one knee, and bruises on one arm. The abrasions on the back of her neck could have been caused by someone squeezing her neck. M.V.

also had injuries on her genitalia consistent with penetration. M.V.'s urine was tested for GHB, cocaine, and other drugs, and none was detected.

A few days after making her initial report, M.V. was contacted by a detective who asked if she would place a recorded call to defendant and ask questions about the night in question. M.V. ultimately made three such calls.

During the first call, M.V. asked defendant what happened at his apartment. Defendant recounted the events, describing their sexual encounter in detail and asserting M.V. had been an active and interested sexual partner. He also claimed she had been "super aggressive" during sex. Defendant said M.V. had asked him to pull her hair, and when M.V. asked if that was why her hair was coming out in chunks, defendant replied, "[e]xactly." M.V. told defendant she did not remember much of the night and had been "weirded out" when she woke up and defendant did not want to let her leave. Defendant said he wanted her to stay so they could talk things out, and because he didn't want M.V. to leave and start inventing her own interpretation of the events. M.V. said she thought defendant was really mad at her because he broke his glasses. Defendant denied being angry, but he did not address M.V.'s statement regarding his glasses.

During the second call, M.V. told defendant she did not believe some of the things he said during the first call and she was not comfortable with some of things defendant had done. M.V. referenced defendant choking her the morning after and stated that was not something she had ever done before, or would ever do. Defendant did not directly address M.V.'s assertion that he choked her. Instead, defendant said he had never had sex with her before, so it was all "new to him." He claimed M.V. kept

saying "come on Aaron" and grabbing him from behind and pulling him into her very violently. Defendant told M.V. she was cognizant the entire time and he had no idea at the time that she was not aware of what was going on.

During the final call, M.V. told defendant she could not wrap her mind around his behavior the morning after the incident, specifically, his attempt to "guilt her" and his statement that she needed to make him feel better. Defendant denied making that statement, but he did admit to saying she had made him feel bad. M.V. then told defendant that he made her promise to never make him feel that bad about himself again. Defendant did not confirm or deny that; instead, he said she made him feel terrible and was making him feel terrible again. M.V. said she knew defendant was a creep and said she had told him a week earlier that he was a creep and she wasn't going to sleep with him. Defendant did not address the "creep" comment but he did say he did not recall M.V. saying she was not going to sleep with him. M.V. also asked defendant about the "liquid G" he had "in [his] car." Defendant said it was GHB. M.V. asked if she had ingested any of it and he said neither of them had done so.

In June 2009, the police arrested defendant and searched his bedroom. They recovered Ultram pills, Viagra pills, a vial of steroids, a 5-hour energy bottle, and a large quantity of disposable syringes. Subsequent laboratory testing confirmed the substance inside the 5-hour energy bottle was GHB.

C.     *After a Pretrial Hearing, M.V. Initially Declines to Participate in Defendant's Prosecution but Later Reconsiders*

M.V. testified against defendant at a pretrial hearing in 2009.  During her testimony, she lied in response to questions about her prior drug use because she was uncomfortable with the questions and believed they were irrelevant.[6]

After that testimony, M.V. declined to continue supporting defendant's prosecution.  She felt defendant's attorney was aggressive about her drug use and she was scared.  M.V. did not want to reveal the drug use because she felt ashamed of it and thought it would hurt her career.

Less than a year later, however, M.V. received a call from either a detective or a deputy district attorney informing her defendant had "done it again" and asking if she would be willing to testify against defendant in a new trial.  M.V. felt horrible and blamed herself for what happened to the other woman.  She decided to testify knowing she would have to disclose her drug use.

D.     *The Offense Conduct Pertaining to T.C., As Established by the Evidence at Trial*

T.C. and defendant first met in 2003 or 2004.  They became friends and engaged in a sexual relationship for around five months.  The relationship ended amicably.  T.C. reconnected with

---

[6]     In fact, M.V. was consuming alcohol and occasionally using heroin when she met defendant.  She also had a prior history of other drug use.  She did not use any heroin the day before or the night of the incident.  She could not recall whether she had used drugs in the weeks prior, but she thought it was possible.

defendant six or seven years later, when she thought she saw him at a sports bar and sent him a text message. They made plans to meet at a martini bar.

They met on October 19, 2010. Defendant picked T.C. up around 8:00 p.m. and drove them to the bar. While there, T.C. had some food and two or three martinis. T.C. invited defendant to go to a comedy show because she had plans to meet friends there. Defendant told T.C. he needed to go home to give his dog medication, she accompanied him, and he persuaded her to come inside and have a drink before leaving for the comedy show.

Defendant made T.C. a martini. T.C. thought the drink tasted strange. While at defendant's apartment, T.C. sent a text message to a friend stating defendant was "hotter than ever." T.C. did not see defendant give any medicine to the dog. After defendant made her the martini, defendant said the dog needed to go outside. Defendant told T.C. to join him, encouraged her to bring the drink with her, and kept urging her to take a sip of it. When they returned to his apartment, things became "hazy" for T.C. and she blacked out for some period of time.

During some "flashes of awareness," T.C. recalled kissing defendant, being on the couch, and her tights being aggressively taken off. She remembered a pain in her head, fighting, and being in a constant struggle. T.C. also recalled an abrupt piercing pain in her rectum while defendant was on top of her. She could not remember if her clothes were on or off when she felt the pain in her rectum. She did not remember feeling pain in any other private parts at the time, but she did remember feeling pain in other areas, feeling trapped, and flailing and kicking. T.C.'s next clear memory was of being in a cab and dialing numbers on her phone.

14

Unbeknownst to T.C. (and for many years, the authorities, until the evidence later came to light), defendant surreptitiously recorded what occurred with T.C. in his bedroom on the night of October 19, 2010.[7] Eight excerpts of the recording were played during the prosecution's case at defendant's later criminal trial. The first excerpt depicts defendant setting up the camera to record before leaving his apartment to rendezvous with T.C. (the recording was left running for hours until he later returned with her). The remaining excerpts depict what appear to be figures moving in the dark; the bedroom light coming on and, thereafter, defendant and T.C. naked with T.C. appearing to struggle against defendant, or resisting or hitting him; T.C. attempting to put her bra back on before defendant pulls her back down to the bed; and defendant turning off the camera after T.C. was no longer in the bedroom and the sexual activity had ceased. According to testimony at defendant's later criminal trial from T.C. (summarized *post*) and an investigating detective who watched the entire video, other portions of the recording that were not played for the jury during the prosecution's case depict T.C. appearing to initiate sex acts or appearing to engage in sex acts without resistance.

### E. T.C.'s Rape Report and Subsequent Police Investigation

Jason Lee (Lee), one of T.C.'s friends, received a call from her after midnight on October 20. She sounded distraught, as if she was or had been crying. T.C. asked if Lee could come over.

---

[7] The video has no sound after the first few minutes, and thus no audio of defendant's interactions with T.C.

Lee asked her what was wrong, but she did not tell him over the phone.

When Lee arrived at her apartment building, T.C. looked like she had been punched in the face. He asked her what happened, and she said she thought she had been raped. T.C. then described the pertinent events and seemed scared while talking about it. Lee asked her if she wanted to call the police. She was hesitant, but she eventually did.

After a first pair officers arrived and T.C. began speaking to them, she sent them away because she was scared or offended by their demeanor. Lee kept talking to her, and she eventually decided to call the police again because she was worried that what happened to her might happen to somebody else. A second set of officers arrived, took her statement, and then took her for a sexual assault examination.

The examination at the rape treatment center revealed T.C. had tenderness and swelling on her right temporal area and her lip. She had bruises on her elbow and chest, and abrasions on her forearm and back. T.C. also reported tenderness of the hymen. The examiner believed the injuries were consistent with a struggle and a physical blow. Examination of T.C.'s buttocks, anus, and rectum revealed no assault-related findings. T.C.'s urine was tested for GHB, cocaine, and other drugs, and none was detected.

> F. *The Criminal Proceedings Against Defendant, Including Trial, Grant of a Motion for New Trial, and Retrial*

In 2011, the Los Angeles County District Attorney filed a six-count information against defendant alleging he raped M.V.

by use of drugs and assaulted her by choking her.  The information additionally alleged defendant sodomized T.C. by use of force, assaulted her with intent to commit various sexual assault felonies, forcibly raped her, and attempted forcible oral copulation with her.

After a trial—at which the existence of the video recording of defendant and T.C. on the night in question was unknown to the jury—defendant was convicted of five of the six counts in December 2013 (the jury did not reach a verdict on the count charging defendant with attempted forcible oral copulation).[8] Defendant obtained new counsel and filed a motion for new trial. The trial court granted the motion as to the counts regarding T.C. because the video had not been presented during the trial. Defendant then filed a second motion for new trial, arguing the cross-admissibility of the evidence between the counts pertaining to T.C. and those pertaining to M.V. was prejudicial and the trial court granted that motion too.

Following a series of continuances stretching over a number of years, defendant's retrial commenced in July 2022. The amended information against defendant again charged him with rape by use of drugs (count one) and assault by means likely to produce great bodily injury (count two) as to M.V.; and sodomy by use of force (count three), assault with intent to commit a felony (count four), forcible rape (count five), and attempted forcible oral copulation (count six) as to T.C.  M.V. and T.C.

---

[8]     The defense was in possession of the video but made a tactical decision not to introduce it in evidence or reveal its existence to the prosecution.

testified during the retrial, along with experts, law enforcement officers, and other witnesses.

M.V. and T.C.'s testimony described the offense conduct we have already summarized. T.C. also specifically addressed the video recording made by defendant. She testified she did not learn defendant made a video recording without her consent until after defendant's first trial. She watched all the sexual activity in the video prior to testifying. She estimated that she remembered less than a minute or two of the events depicted on the more than 40 minutes of footage. She agreed there were portions of the video where it looked like she was willingly engaging in or initiating sexual contact, but she did not remember any part of that.

Dr. Teri Stockham, a forensic toxicologist, testified about the effects of alcohol and GHB. According to Dr. Stockham, GHB is used for legal purposes (to treat daytime narcolepsy) and illegal purposes, e.g., in drug-facilitated sexual assault and as a substitute for ecstasy. GHB has a short onset period, a duration of six to seven hours, and has a short window of detection— approximately six hours in the blood and 12 hours in a urine sample. GHB can be added to any kind of drink. One of its street names is "liquid G." At lower doses, GHB induces a euphoric feeling, decreased inhibitions, and increased libido. At higher doses, the effects of GHB include drowsiness, blurred vision, loss of motor control, and loss of consciousness. When presented with a hypothetical that mirrored M.V.'s alcohol consumption and memory lapses, Dr. Stockham opined M.V.'s behavior and memory lapses were not consistent with the consumption of two and a half alcoholic drinks but were consistent with a dose of GHB.

During the defense case, the defense played for the jury the full 40-plus-minute period of sexual activity between defendant and T.C. seen on the video recording once the bedroom light came on.  Defendant also testified in his own defense.

Defendant denied drugging M.V. or T.C. and maintained his sexual activity with them (activity that he did not dispute occurred) was consensual.  Defendant claimed he had and used GHB in his possession as a sleep aid.  He also claimed both women enjoyed "rough sex."  He specifically denied penetrating T.C.'s anus.

When questioned about what occurred when M.V. woke up the morning after the night in question, defendant denied restraining M.V. or doing anything to stop her from leaving.  He also testified his glasses lens popped out when he was holding them that morning but he did not recall anything else happening to them.  As for the pretext calls, defendant testified he never choked M.V. and did not respond to her statements to the contrary during the calls because she was "throwing so much at him" that he had to pick and choose what to address.

When questioned about the video he recorded of T.C., defendant claimed he set up a camera to record because he was paranoid—by the time he reconnected with T.C. he had already been accused of assault by M.V. and he believed that if his encounter with M.V. had been recorded, he would never have been charged.  Defendant also claimed that after he finished having sex with T.C., she told him she wanted to date him again, he did not want to date her, and he called a cab to take her home because he did not want to wake up next to her and wanted her out of his apartment.

In addition to presenting defendant's testimony, the defense also called its own toxicologist, Dr. Marvin Pietruszka, to testify. He opined that if a person received a dose of GHB low enough to remember details about an event, the GHB's only effect would be a sensation of euphoria. If, on the other hand, a person received a dose high enough to incapacitate them physically and mentally, the dose would make it impossible for them to socialize or remember things, they would have slurred speech, and it would be obvious there was something wrong with them. In Dr. Pietruszka's opinion, if a person who had been administered GHB were capable of sending text messages, they could only have received a very low dose.

Outside the presence of the jury, the court and counsel discussed the instructions that should be given to the jurors. The prosecution asked the court to instruct the jury on adoptive admissions with CALCRIM No. 357.[9] The prosecution argued the

---

[9] CALCRIM No. 357 provides: "If you conclude that someone made a statement outside of court that (accused the defendant of the crime/ [or] tended to connect the defendant with the commission of the crime) and the defendant did not deny it, you must decide whether each of the following is true: [¶] 1. The statement was made to the defendant or made in (his/her) presence; [¶] 2. The defendant heard and understood the statement; [¶] 3. The defendant would, under all the circumstances, naturally have denied the statement if (he/she) thought it was not true; [¶] AND [¶] 4. The defendant could have denied it but did not. [¶] If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true. [¶] If you decide that any of these requirements has not been met, you must not

20

instruction was warranted because M.V. made certain statements in the pretext calls that defendant did not deny. Specifically, the prosecution identified M.V.'s statements that defendant had been aggressive with her the morning after the rape, that there had been a choking incident, and that defendant had broken his glasses. Defendant objected and expressed doubt that anything in the pretext calls qualified as an adoptive admission. The court explained the issue was defendant's "nonresponse or non-denial" of certain statements. Defense counsel did not argue the issue further, and the court stated giving CALCRIM No. 357 was warranted.

In addition to later instructing the jury with CALCRIM No. 357, the court also gave CALCRIM 200 (informing the jury that some of the instructions given might not apply) and CALCRIM 875 (informing the jury of the elements of the crime of assault by means likely to cause great bodily injury). There was no request to give an instruction on a lesser included offense of simple assault and no such instruction was given.

### G. Guilty Verdicts, New Trial Motion, and Sentencing

The jury convicted defendant on all counts. Defendant filed a motion for new trial pursuant to Penal Code section 1181, subdivision (6), arguing there was insufficient evidence to support the jury's verdict.[10] Defendant maintained there was no

---

consider either the statement or the defendant's response for any purpose."

[10] Undesignated statutory references that follow are to the Penal Code.

evidence he put GHB in M.V.'s drink and he argued T.C. had engaged in consensual sex with him.

At the hearing on the motion for new trial, the court stated on the record that it had read and considered defendant's motion. After giving counsel the opportunity to argue, the trial court denied the motion. In doing so, the court made the following remarks:

> "There was certainly sufficient evidence in this case to support the conclusion by the jury that the defendant was guilty beyond a reasonable doubt of all of the charges. The jury had an ability to not only listen to the evidence but also look at the witnesses, as they testified. And, in this particular case, I think that is very important, because a cold record never can really capture how somebody responds to questions, their attitude, et cetera. The jury certainly can.
>
> "And I have to tell you, the two witnesses that testified, the two alleged victims—it's no longer 'alleged'—but the two victims in this case certainly testified, and their credibility was overwhelming, especially based on everything else, compared especially to the defendant's testimony, which was not credible.
>
> "So I find that the jury certainly had sufficient evidence to prove beyond a reasonable doubt that the defendant was guilty, and I'm going to deny the motion for new trial."

At sentencing, the court heard victim impact statements from T.C. and M.V. and statements from individuals supporting defendant. Proceeding to argument, the defense contended counts three (for forcible sodomy of T.C.) and five (for forcible

22

rape of T.C.) should be sentenced concurrently, not consecutively, because they were part of continuous sexual activity.

The court sentenced defendant to 22 years in prison. It designated count one (rape of M.V.) as the base term and imposed the middle term of six years on that count. The court imposed consecutive middle term sentences of three years on count two (for aggravated assault of M.V.), six years on count three (forcible sodomy of T.C.), and six years on count five (forcible rape of T.C.). It sentenced defendant to one-third the middle term, or one year, on count six (attempted oral copulation of T.C.) and stayed the sentence on count four (assault on T.C. with intent to commit a felony) pursuant to section 654.

When elaborating on the reasons for its sentence, the trial court stated it took a number of factors into consideration, including defendant's "conduct when he testified" and "his total lack of credibility with regard to that . . . ." As for the court's decision to run the sentences for counts three and five consecutively, the court stated it watched the video and the video had not helped defendant because it established there was a sufficient break in the criminal acts to warrant consecutive sentencing.

## II.  DISCUSSION

For reasons we first summarize and then detail, we reject all of defendant's arguments save one and we remand for resentencing so the trial court has the opportunity to modify the sentence it previously imposed, if it so chooses. (*People v. Buycks* (2018) 5 Cal.5th 857, 893; *People v. Burbine* (2003) 106 Cal.App.4th 1250, 1259 ["[U]pon remand for resentencing after the reversal of one or more subordinate counts of a felony

23

conviction, the trial court has jurisdiction to modify every aspect of the defendant's sentence on the counts that were affirmed, including the term imposed as the principal term"].)

Though the trial court's remarks in connection with defendant's motion for new trial include some ambiguous language, the record on the whole reflects the court was well aware of its prerogative to evaluate witness credibility in weighing the motion and did not suffer from an unawareness of the appropriate legal standard for evaluating the motion. Defendant's instructional error arguments fail because there was substantial evidence to justify giving an adoptive admission instruction but no substantial evidence warranting an instruction on the lesser included offense of simple assault. Defendant's conviction on the forced sodomy charge, on the other hand, is unsupported by sufficient evidence; T.C. testified about feeling pain in her anus during defendant's rape, but there is no testimony or other evidence that satisfies an essential element of the offense: that penetrative contact by defendant's penis is what caused that pain.[11]

### A.    The Trial Court Did Not Err in Denying Defendant's Motion for New Trial

Defendant moved for a new trial pursuant to section 1181, subdivision (6). That section states a trial court may grant a new trial "[w]hen the verdict or finding is contrary to law or evidence."

---

[11]    Because we reverse defendant's sodomy conviction, we need not address defendant's contention that the trial court erred in sentencing him to consecutive, rather than concurrent, terms on the counts for forcible rape and forcible sodomy of T.C.

24

(§ 1181, subd. (6).) "'In reviewing a motion for a new trial, the trial court must weigh the evidence independently. [Citation.] It is, however, guided by a presumption in favor of the correctness of the verdict and proceedings supporting it. [Citation.] The trial court "should [not] disregard the verdict . . . but instead . . . should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict." [Citation.]' [Citation.]" (*People v. Fuiava* (2012) 53 Cal.4th 622, 729-730.) "A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion. ""The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears."' [Citation.]' [Citation.]" (*Ibid*.)

Defendant contends the trial court misunderstood the scope of its authority, including its duty to independently weigh the evidence, when ruling on his motion for new trial. Some of the trial court's remarks are amenable to such an argument, but considering the briefing before the court and the court's remarks in their entirety, we do not believe the trial court misapplied the governing legal standard.

In denying the motion, the trial court stated it had read and considered defendant's papers, which recited the proper standard the trial court was to apply in considering motion for new trial under section 1181, subdivision (6). (See *People v. Risenhoover* (1968) 70 Cal.2d 39, 57-58.) Importantly, the trial court also expressed its own view of M.V. and T.C.'s credibility, stating their testimony was "overwhelming, especially based on everything else" and "compared especially to the defendant's

25

testimony," which the court deemed "not credible." This irrefutably establishes the trial court made an independent evaluation of testimony by M.V., T.C., and defendant, and the trial court's reference to "everything else" is fairly read to encompass the other evidence presented at trial. To be sure, the court did also remark that there was "certainly sufficient evidence . . . to support the conclusion by the jury that the defendant was guilty beyond a reasonable doubt of all of the charges" and that "the jury certainly had sufficient evidence to prove beyond a reasonable doubt that the defendant was guilty." These expressions are framed in terms of what the jury had done, but the court made those remarks in the context of explaining the jury, like the court, had been able to look at the witnesses as they testified, a fact the court deemed "very important" in "this particular case." The trial court at no point indicated it was bound or otherwise constrained by the jury's verdicts; to the contrary, the court's comments demonstrate that its view of the evidence—particularly the "overwhelming" credibility of T.C. and M.V.—was consistent with the jury's conclusions.[12] Although it may "have been preferable for the court to have been more specific, stating it was denying the motion based on its independent weighing of the evidence, its failure to do so and its use of less than artful language cannot be equated with having applied the wrong standard."[13] (*People v. Price* (1992) 4 Cal.App.4th 1272, 1276.)

---

[12] The trial court's comment that defendant had a total lack of credibility when he testified also supports this view.

[13] Defendant argues the court here did not express its own view of the evidence, contending the case is akin to *People v.*

## B. *The Trial Court Did Not Err in Instructing the Jury on Adoptive Admissions*

"""[B]efore a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference [citation]." [Citation.]' [Citation.]" (*People v. Alexander* (2010) 49 Cal.4th 846, 920-921; see also *People v. Chism* (2014) 58 Cal.4th 1266, 1298 [error to instruct on adoptive admissions where "there was no properly admitted evidence of an adoptive admission"].) "'[A] trial court has broad discretion to determine whether a party has established the foundational requirements for a hearsay exception[,]'" and we review its "'conclusions regarding foundational facts for substantial evidence.' [Citation.]" (*Chism, supra*, at 1297.)

Defendant argues it was error to give CALCRIM No. 357 on adoptive admissions because the pretext calls provided no basis

---

*Robarge* (1953) 41 Cal.2d 628, *People v. Watts* (2018) 22 Cal.App.5th 102, and *People v. Carter* (2014) 227 Cal.App.4th 322 at 328. That reflects a mistaken view of the record for reasons we have already explained, but none of defendant's cited cases is analogous in any event. In both *Robarge* and *Carter*, the trial courts stated they had different views of the evidence than the jury did. (*Robarge, supra*, 41 Cal.2d at 634 [trial court made remarks demonstrating it disbelieved witness testimony and entertained serious doubts as to identification of defendant]; *Carter, supra*, 227 Cal.App.4th at 326, 328 [trial court stated it would have weighed the evidence differently than the jury, and found defendant's alibi evidence credible].) In *Watts, supra*, at 113 the court repeatedly stated it could not reweigh the evidence, and said it was not its place to second guess the jury. There are no parallels to the trial court's ruling here.

to infer defendant impliedly admitted to criminal activity. He asserts "[t]here was nothing that [M.V.] said that accused [defendant] of criminal activity that he failed to deny." That, however, overstates matters.

Defendant's responses to M.V. during the pretext calls did not deny all of her accusations. For example, during one of the calls, M.V. stated defendant choked her the morning after the rape. Defendant responded by asserting M.V. was the initiator of their aggressive sexual encounter. While a jury might reasonably view that as an attempted justification for defendant's actions, it does not, in fact, deny M.V.'s statement that defendant choked her. The jury could reasonably have construed defendant's response (or lack of response to the direct statement that he had choked M.V.) as a tacit admission to having done so—and used that fact (the choking) as part of its deliberations on guilt. (See, e.g., *People v. Riel* (2000) 22 Cal.4th 1153, 1189 [a defendant's "silence, *evasion*, or *equivocation*" may be considered a tacit admission], italics added.) During a different call, M.V. said defendant broke his glasses the morning after the rape and she thought he was angry at her. Defendant's response—claiming he was not angry at her—again is not a denial of M.V.'s assertion that he broke his glasses by hurling them against a wall (and the jury could infer from that unaddressed fact that defendant was indeed angry).

A reasonable juror could have interpreted defendant's failure to deny M.V.'s statements, or parts thereof, as incriminating admissions. The trial court did not instruct the jury that it must consider defendant's silence, evasion, or equivocation on these points to be admissions. Rather, the trial court gave the jury an instruction that gave them the legal

28

framework to properly decide whether they were.  That was appropriate.[14]

### C.     The Trial Court Had No Sua Sponte Duty to Instruct on Simple Assault

"'[A] trial court must instruct a criminal jury on any lesser offense "necessarily included" in the charged offense, if there is substantial evidence that only the lesser crime was committed.' [Citation.]" (*People v. Smith* (2013) 57 Cal.4th 232, 239.)  "'[T]he existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury.  [Citations.]  "Substantial evidence" in this context is " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]'" that *the lesser offense, but not the greater*, was committed.  [Citations.]' [Citation.]"

---

[14]     Insofar as defendant's argument is that he denied all statements that outright accused him of committing a crime and that was enough to preclude an adoptive admission instruction, the argument is unpersuasive.  Adoptive admissions (like other admissions) are admissible not only when they are outright admissions to having committed a crime but also when they are merely incriminating, i.e., they have a "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, §§ 210, § 1221; CALCRIM No. 357 ["If you conclude that someone made a statement outside of court that (accused the defendant of the crime/ *[or] tended to connect the defendant with the commission of the crime*) and the defendant did not deny it . . ."], italics added.) That is the case here.

(*People v. Hughes* (2002) 27 Cal.4th 287, 366-67.) "'"[I]f there is no proof, other than an unexplainable rejection of the prosecution's evidence, that the offense was less than that charged, [instructions on lesser included offenses] shall not be given."' [Citation.]" (*People v. Friend* (2009) 47 Cal.4th 1, 52-53.) Our review of whether the trial court erred by not instructing on a lesser included offense is de novo. (*People v. Licas* (2007) 41 Cal.4th 362, 366.)

Simple assault under section 240 is necessarily included in the offense of assault by means likely to inflict great bodily injury under section 245. (*People v. Yeats* (1977) 66 Cal.App.3d 874, 879; *People v. Rupert* (1971) 20 Cal.App.3d 961, 968.) The question here is thus whether there is substantial evidence on which a reasonable jury could have concluded defendant committed the lesser offense of simple assault on M.V. but not the greater offense of assault by means likely to inflict great bodily injury.

Simple assault is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) Assault by means of force likely to inflict great bodily injury, in contrast, requires an assault committed by means of force "which is significant or substantial, not insignificant, trivial or moderate." (*People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1066 [defining great bodily injury]; see also *People v. Washington* (2012) 210 Cal.App.4th 1042, 1047 [some physical pain or damage, such as abrasions, lacerations, and bruising is sufficient to show great bodily injury].) A person can be guilty of an assault by means of force likely to cause great bodily injury even when causing no injury—so long as the person's actions made a serious injury likely. (*People v. Drayton*

(2019) 42 Cal.App.5th 612, 617; see also *People v. McDaniel* (2008) 159 Cal.App.4th 736, 748 [evidence need not establish great bodily injury, but only that defendant exerted sufficient force to inflict such an injury]; *People v. Aguilar* (1997) 16 Cal.4th 1023, 1028 ["[T]he use of hands or fists alone may support a conviction of assault 'by means of force likely to produce great bodily injury'"].)

Here, there was insufficient evidence defendant committed simple assault without force likely to cause great bodily injury. M.V.'s testimony was that defendant choked her hard and long enough that her vision blacked out. She stated her vision returned when she was able to draw in oxygen, supporting the inference that defendant cut off her breathing by choking her. M.V. also sustained an abrasion to the back of her neck that was consistent with someone squeezing it. Church also observed bruises on the front of her neck when he saw her approximately an hour after she was finally able to leave defendant's home. This is strong evidence of force sufficient to impede a victim's breathing, and that is force likely to produce great bodily injury. (See, e.g., *People v. Covino* (1980) 100 Cal.App.3d 660, 664-665, 667-668 [evidence that the defendant squeezed victim's neck, victim appeared to be gasping and choking, and photographs at the scene showed redness on her neck and back established force likely to produce great bodily injury].)

In his effort to argue the record nonetheless includes substantial evidence of simple assault, defendant points to the lack of injury to the front of M.V.'s neck, his perception of ambiguity in her testimony about whether she became unconscious when defendant choked her the first time, and her testimony that she did not lose consciousness the other two times

31

defendant choked her. None of these factors establish defendant acted without force likely to cause great bodily injury. The degree of force required to cause M.V.'s vision to black out and to cause abrasions to the back of her neck cannot be described as "insignificant, trivial or moderate." (*Aguilar*, *supra*, 16 Cal.4th at 1028.) Further, Church's testimony establishes that M.V. had some visible marks on the front of her neck shortly after the assault, even if no bruises were visible by the time she underwent the sexual assault examination.

What we have already said establishes there was no error. But in addition, defendant denied choking M.V. at all during his own sworn testimony during trial. The jury was therefore effectively left with two choices. It could credit M.V.'s testimony and conclude defendant choked her with sufficient force to cause her vision to black out, or it could reject that testimony in favor of defendant's. No lesser included offense instruction was required under such circumstances. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1052; *People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1019-1020 [duty to instruct on lesser included offenses is circumscribed "when there is a complete denial of any complicity in the charged crime by the accused"].)

### D. Substantial Evidence Does Not Support Defendant's Sodomy Conviction

When considering a challenge to the sufficiency of the evidence to support a conviction, "'"we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable

32

doubt.""" (*People v. Williams* (2015) 61 Cal.4th 1244, 1281.)  The standard is deferential, but the requisite substantial evidence is lacking here as to one of the essential elements of the charged sodomy offense.

"Sodomy is sexual conduct consisting of contact between the penis of one person and the anus of another person.  Any sexual penetration, however slight, is sufficient to complete the crime of sodomy."  (§ 286, subd. (a).)  Viewing the evidence in the light most favorable to the judgment and considering T.C.'s testimony sufficient to establish there was some sort of anal penetration, the record still lacks sufficient evidence the penetration consisted of contact between defendant's penis and T.C.'s anus.

T.C. testified at trial that she felt an abrupt, piercing pain in her rectum at some point while defendant was on top of her.  She could not remember if her clothes were on or off at the time.  T.C. did not testify the pain was caused by any contact with defendant's penis.  Nor did she testify to any contact between defendant's penis and her anus, painful or otherwise.

No other evidence admitted at trial supplies what is missing.  T.C.'s sexual assault examination did not result in any assault related findings in the area of her anus or rectum.  The video of defendant's assault of T.C. also does not supply adequate, non-speculative evidence of penis-anus penetration either.  Thus, the most that can be said for the jury's verdict on the forcible sodomy count is that there was some anal penetration and it is equally possible that penetration could have been caused by defendant's penis or one or more of his fingers.  "When the facts give equal support to two competing inferences, neither is

established."[15] (*People v. Acevedo* (2003) 105 Cal.App.4th 195, 198; see also *People v. Moore* (2011) 51 Cal.4th 386, 406 ["That an event *could* have happened . . . does not by itself support a deduction or inference it did happen"].)

---

[15] The Attorney General argues the evidence was sufficient because the jury was entitled to believe T.C.'s testimony and any reasonable inferences from that testimony. The jury was so entitled, and it could (and did) certainly credit her testimony that she felt a piercing pain in her rectum and that defendant was on top of her when she felt it. That testimony, without something more (and there was no more), does not provide a basis to infer defendant sexually penetrated her anus with his penis. And proof of that is what was necessary for the sodomy offense with which defendant was charged.

## DISPOSITION

Defendant's conviction on count three, sodomy by use of force, is reversed.  The remainder of defendant's convictions are affirmed.  The matter is remanded to the trial court with directions to resentence defendant.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, Acting P. J.

We concur:



MOOR, J.



KIM, J.